IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Henry Christopher Johnson, | ) | C/A No. 1:10-2114-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

　　　　This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the Honorable Cameron McGowan Currie's December 17, 2010 order referring this matter for disposition. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals.

　　　　Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards.  For the reasons that follow, the Commissioner's decision is affirmed.

I.    Relevant Background

A.    Procedural History

In his DIB application, filed April 4, 2007,[1] Plaintiff claimed disability that began June 1, 2006. Tr. at 94–97. Plaintiff's application was denied initially and on reconsideration.  Tr. at 51–55, 59–60. Plaintiff appealed, and on July 23, 2009, the Administrative Law Judge ("ALJ") held a hearing at which Plaintiff and vocational expert ("VE") William W. Stewart testified. Tr. at 20–38. In a September 1, 2009 decision, the ALJ found Plaintiff was not disabled. Tr. at 10–19. On June 18, 2010, the Appeals Council denied Plaintiff's request for further review, making the ALJ's decision the Commissioner's final decision for purposes of appeal. Tr. at 1–3. On August 12, 2010, Plaintiff timely filed this action seeking judicial review of the Commissioner's decision. [Entry #1].

B.    Relevant Background and Medical History

Plaintiff was born on June 16, 1966, is a high school graduate, and was 39 years old on his alleged onset date. Tr. at 23, 24, 94. He has past relevant work ("PRW") as a coating operator at a tape manufacturing plant, a chemical operator, and a sanitation worker. Tr. at 111.

---

[1]Plaintiff's application of record is dated April 4, 2007, and the ALJ indicates Plaintiff filed his application on March 21, 2007. *Compare* Tr. at 19 *with* Tr. at 94–97.

Plaintiff sustained a work-related back injury,[2] and on June 11, 2006, he went to the Providence Hospital Emergency Room ("ER") because of sharp lower back pains. Tr. at 257–59. Plaintiff reported his pain as a 9/10, and the ER physician diagnosed him with lumbar strain. Tr. at 258–59.

On June 14, 2006, Plaintiff saw David L. Keisler, M.D. of Family and Preventive Medicine ("FPM") for his low back pain. Tr. at 187–89. Dr. Keisler noted Plaintiff's job involved heavy lifting and that he had not worked since his June 11, 2006 ER visit. Tr. at 187. On examination, Dr. Keisler found Plaintiff had non-radiating pain in his low back and that his gait and straight-leg-raise test results were normal. Tr. at 187–89. Dr. Keisler assessed back pain, continued Plaintiff on Ultracet tablets, and prescribed Robaxin. Tr. at 189. Dr. Keisler instructed Plaintiff not to return to work before following up with him the following Monday, and to refrain from bending or lifting. *Id.*

On June 19, 2006, Plaintiff returned to FPM and saw Tan J. Platt, M.D., who noted Plaintiff walked with a limp and diagnosed back pain. Tr. at 193–95. Dr. Platt referred Plaintiff to Columbia Rehabilitation Clinic ("CRC") for physical therapy. Tr. at 195.

Plaintiff went to CRC on June 21, 2006, and the physical therapist ("PT") noted Plaintiff's lumbar region was tender on palpation and that he was experiencing pain and spasms in his lower back. Tr. at 174–75. Plaintiff attended physical therapy for six weeks.

---

[2]Medical records dated June 14, 2006 indicate Plaintiff hurt his back at work approximately two weeks prior. Tr. at 187. Although the precise date of his injury is unclear, it does not impact the court's consideration of this appeal.

Tr. at 168–75, 274. On July 7, 2006, Plaintiff told the PT he was no better after eight therapy sessions. Tr. at 172, 274.

On July 10, 2006, Elizabeth G. Baxley, M.D. of FPM examined Plaintiff, noted he walked with a slight limp, his mid-spine and right paraspinal area was tender to palpation, and bending forward and twisting the torso caused increased pain in his left upper paravertebral back. Tr. at 196–98. Dr. Baxley diagnosed Plaintiff with back pain and indicated Plaintiff should remain out of work for an additional month. Tr. at 198. She instructed Plaintiff to continue physical therapy, pain medications, and muscle relaxers, and she ordered an MRI of Plaintiff's LS spine. Tr. at 198.

A July 17, 2006 MRI of Plaintiff's LS spine revealed "broad-based disk protrusion at L3–L4 and L4–L5," but showed "no evidence of any focal disk protrusion or extruding disk material." Tr. at 276.

On August 7, 2006, Plaintiff saw David L. Greenhouse, M.D. at FPM for his MRI report and noted he continued to have sharp, intermittent low-back pain with an intensity of 3/10. Tr. at 200. Dr. Greenhouse told Plaintiff his lumbar MRI showed disc protrusion with no stenosis and noted Plaintiff continued to improve. Tr. at 200–01. On examination, Plaintiff had no pain with torso movement or forward bending. Tr. at 201. Plaintiff did not complain of leg discomfort, and Dr. Greenhouse noted Plaintiff's gait was normal. *Id.* Dr. Greenhouse extended Plaintiff's work release for an additional two weeks, continued his medication, and instructed him to continue his home exercise program, not to lift more

than five pounds, and to avoid vacuuming, mopping, and strenuous activity. Tr. at 202. Dr. Greenhouse instructed Plaintiff to follow up within two weeks and noted the plan was for Plaintiff to return to work on light duty. *Id.*

On August 23, 2006, Plaintiff saw Holbrook W. Raynal, M.D. at FPM. Tr. at 203–05. Plaintiff reported that he continued to have sharp pain on his right side that shoots to the left side and resulted in a sore lower back. Tr. at 203. Plaintiff reported that he had completed two months of physical therapy, and that he was no better. *Id.* He continued his home exercises, but indicated his low back tightened when he walked and that he began to have low-back pain after standing for four hours. *Id.* On physical examination, Dr. Raynal noted that Plaintiff walked with a wide base stance, had climbed slowly to the examination table, and noted pain lying backward. Tr. at 204. Dr. Raynal noted Plaintiff had pain in his low back on straight leg raising, which was worse when he raised his right leg. Tr. at 205. Dr. Raynal indicated Plaintiff had a diminished patella and absent Babinski reflex and referred Plaintiff for a neurosurgery evaluation. *Id.* Dr. Raynal diagnosed Plaintiff with chronic lumbosacral back pain and added ibuprofen to his other pain medications. *Id.* Dr. Raynal instructed Plaintiff to continue home exercises and extended his work leave for three more weeks. *Id.*

On September 26, 2006, Plaintiff saw Dr. Raynal and indicated that NSAIDs improved his pain and permitted him to stand for longer periods of time. Tr. at 206. Dr. Raynal prescribed Naprosyn and again diagnosed Plaintiff with chronic lumbrosacral

back pain. Tr. at 208. Dr. Raynal instructed Plaintiff to avoid back strain and extended his work excuse pending the neurosurgical examination. *Id.*

When Plaintiff returned to FPM on October 12, 2006, he told Dr. Raynal that he was much improved, but that he continued to have dull low-back pain that he rated as a 4/10. Tr. at 210.  Plaintiff said he was doing home exercises, felt stronger, and could walk long distances. *Id.* Plaintiff voiced concerns about whether he would be able to lift 40-to-50-pound shafts when he returned to work. *Id.* On examination, Dr. Raynal noted Plaintiff could flex his feet forward, had strong muscle tone in his lower extremities, could push outward against pressure, had a normal gait, and showed no effusion or crepitous in his knees. Tr. at 211. Dr. Raynal diagnosed chronic lumbrosacral back pain, noted Plaintiff was scheduled for his neurology consultation the following day, and indicated Plaintiff should be able to return to work, pending agreement by the neurologist. Tr. at 212.

When Plaintiff returned to FPM on October 30, 2006, Dr. Raynal noted Plaintiff had returned to work on light duty, but reported re-injuring his back after four nights. Tr. at 213. Plaintiff told Dr. Raynal that when he re-injured his back, he immediately felt back pain that was equal to the pain from the initial injury and could not continue to work. *Id.* On examination, Dr. Raynal noted Plaintiff had an antalgic gait, back pain localized in the mid bilateral paraspinal area with no spinal point tenderness, and no paraesthesias. Tr. at 214–15. Because Plaintiff's July 17, 2006 MRI indicated a potential thinning and secal sac compression, Dr. Raynal planned to obtain a recommendation from

a specialist. Tr. at 215. Dr. Raynal diagnosed Plaintiff with chronic lumbrosacral back pain, ordered him not to return to work pending the neurological referral, and continued him on Naprosyn and Flexeril with instructions that he was not to drive or operate machinery that required alertness. *Id.*

On December 6, 2006, Plaintiff saw Nasir Waheed, M.D. of Columbia Neurological Associates, who performed a Nerve Conduction Study ("NCS") that indicated Plaintiff had no evidence of lumbrosacral radiculopathy. Tr. at 280–81.

Plaintiff returned to Dr. Keisler of FPM on December 20, 2006. Tr. at 219–21. Plaintiff told Dr. Keisler he had seen a neurologist and had been told he may need surgery at some point, but Dr. Keisler noted he had not seen the neurologist's report. Tr. at 219. Dr. Keisler noted Plaintiff had an antalgic gait, a moderately-decreased range of motion, and experienced pain on movement and bending. Tr. at 220. Dr. Keisler diagnosed back pain and he instructed Plaintiff to continue with neurology for treatments, to continue taking Naprosyn, not to return to work, and not to lift or bend. Tr. at 221.

On referral from Frank O. Pusey, M.D. of Columbia Neurological Associates, Plaintiff saw pain specialist William Odom, M.D. of Advanced Pain Therapies for possible injection therapy on January 24, 2007. Tr. at 180, 286. On initial evaluation, Plaintiff described his pain as a 6 to 7/10, mostly in his lower back and left buttock with minimal radiation to the leg. Tr. at 180. Plaintiff stated that his pain was always present, "but aggravated with activities such as walking and standing for any period of time" and

that it caused him to have difficulties with sleep. Tr. at 180. On examination, Dr. Odom found Plaintiff had a slightly antalgic gait favoring the left, but that he could heel and toe walk without difficulty. *Id.* Dr. Odom administered an epidural steroid injection, prescribed Elavil, Voltaren, and Vicoprofen for pain, and instructed Plaintiff to return in two weeks. Tr. at 180.

Plaintiff saw Dr. Odom on February 7, 2007, and told him the epidural injection had given him relief for only two or three days. Tr. at 179. Dr. Odom administered a left SI joint injection and continued Plaintiff's medications. *Id.* Plaintiff returned on February 21, 2007, and told Dr. Odom the SI joint injection had provided two and a half weeks of pain relief. Tr. at 178. Dr. Odom administered a left hip bursa injection, which gave Plaintiff immediate relief. Tr. at 178.

On March 15, 2007, Plaintiff saw Dr. Pusey and reported the injections Dr. Odom administered were helping his back pain. Tr. at 183. Dr. Pusey recommended Plaintiff continue to see Dr. Odom for pain-management treatment. *Id.*

On March 26, 2007, Plaintiff returned to Dr. Odom and reported that he felt marked improvement, had returned to a "nearly normal active lifestyle." Tr. at 177. He noted he was out with his son over the weekend playing baseball and "felt a pull in the lower back and left buttock." *Id.* Otherwise, he reported being able to "work and sleep much better without painful inhibition." *Id.* Because Plaintiff had improved, but still had some pain with activity, Dr. Odom discontinued injections, recommended Plaintiff

continue physiotherpaies, and told him to continue his medications when needed for breakthrough pain. *Id.*

Plaintiff returned to Dr. Keisler on March 29, 2007, reporting that he remained unable to work, and that his pain was better, but aggravated by movement. Tr. at 222. Dr. Keisler noted Plaintiff had an antalgic gait, a moderate decreased range of motion, and that movement and bending aggravated his pain. Tr. at 223. Dr. Keisler continued Plaintiff's medications, instructed him to continue to see Dr. Odom for pain management, and noted Plaintiff remained unable to work. Tr. at 223–24.

In April 2007, Plaintiff reported to Dr. Odom that his hip pain remained markedly improved, but that the pain had "moderately returned" in the left buttock, apparently from being fairly active with his son over the past month. Tr. at 244. Dr. Odom administered another SI joint injection and refilled Plaintiff's pain medications. *Id.* Plaintiff reported immediate relief from the injection and was to be reevaluated in six weeks. *Id.*

On June 3, 2007, Plaintiff presented to the ER complaining of severe back and neck pain. Tr. at 289–99. The ER physicians diagnosed Plaintiff with cervical strain, prescribed Percocet for pain, and instructed him to follow up with his primary care provider and an orthopedist. Tr. at 292–93, 296.

On June 27, 2007, Plaintiff returned to Dr. Odom and reported that he had received ten to fourteen days of moderate to very good pain relief following the SI joint injection, but then went to the ER because his medication did not provide sufficient pain relief. Tr.

at 243. Dr. Odom concluded that Plaintiff's hip may have been injured during his accident, administered a hip bursa injection, and increased his pain medication. *Id.*

On July 31, 2007, Plaintiff saw Dr. Odom and reported significant and prolonged relief, with minimal-to-no pain without medication for two or two and a half weeks. Tr. at 242. Plaintiff indicated after that period, the pain returned slowly, requiring him to take one pain pill per day. *Id.* Dr. Odom administered another hip injection, recommended a hip MRI scan and, if necessary, an orthopedic consultation, but noted he was hopeful that a surgical consultation would not be warranted. Tr. at 242.

On September 10, 2007, Dr. Keisler noted Plaintiff had an antalgic gait, a moderately-decreased range of motion, and that his pain was aggravated by movement and bending. Tr. at 301–02. Dr. Keisler continued Plaintiff on his pain medications, told him to continue to see Dr. Odom, and noted Plaintiff was scheduled for an MRI of the LS spine. Tr. at 303.

On December 13, 2007, Plaintiff returned to Dr. Keisler, who noted Plaintiff had an antalgic gait, a moderately-decreased range of motion, and that pain that was aggravated by movement and bending. Tr. at 306. Dr. Keisler noted Plaintiff remained unable to work, and instructed him to continue with his medications and with pain therapy. Tr. at 305–07.

On May 8, 2007, state agency consultant William Hopkins, M.D. reviewed the record and completed a physical residual functional capacity ("RFC") assessment. Tr. at

231–38. He opined Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, and stand/walk/sit about six hours in an eight-hour workday. Tr. at 232. Dr. Hopkins noted Plaintiff's back injury and history of low-back pain, and indicated Plaintiff had no motor, sensory, or reflex deficits and had responded well to injection therapy. *Id.* Dr. Hopkins placed no postural, manipulative, visual, communicative, or environmental limitations on Plaintiff's RFC. Tr. at 233–35.

On September 10, 2007, state agency consultant Ellen Humphries, M.D. also evaluated the record to consider Plaintiff's RFC and made the same findings as Dr. Hopkins. Tr. at 245–52.

Plaintiff returned to Dr. Keisler on April 16, 2008, complaining of worsening back pain. Tr. at 309. Plaintiff told Dr. Keisler he no longer went to pain-management therapy, but was receiving vocational rehabilitation. *Id.* Dr. Keisler noted Plaintiff had an antalgic gait, described his back pain as stable, and recommended Plaintiff have an orthopedic evaluation. Tr. at 310–11. Dr. Keisler also noted Plaintiff was experiencing dizziness on occasion and ordered lab work to assess the dizziness. Tr. at 309.

On June 26, 2008, Plaintiff told Dr. Keisler that medication was helping his pain, but that he was not resting well at night. Tr. at 313. Dr. Keisler concluded Plaintiff's condition was "unchanged," and he continued to recommend an orthopedic evaluation. Tr. at 314.

At the request of the workers' compensation carrier of his employer, Plaintiff saw pain specialist Steven Storick, M.D. of Columbia Neurosurgical Associates' Carolina Spine Center on December 2, 2008, for an "Office Consultation for Second Opinion." Tr. at 330–31. Plaintiff described his injury, pain, and prior treatments, indicating injection treatments provided relief for at least 50% of his pain and explaining that the relief had lasted one or two weeks before his symptoms returned. Tr. at 330. Dr. Storick's report notes he reviewed Plaintiff's lumbar MRI, and that he did not have the NCS results available to review. *Id.* On examination, Dr. Storick found Plaintiff's lumbar spine was aligned and that there was no tenderness along the spinous processes or LS musculature. *Id.* Dr. Storick noted Plaintiff's left SI joint was mildly tender to palpation. Tr. at 330. He complained of left sacroiliac joint pain with forward flexion, and he had a nonantalgic gait. Tr. at 331. Dr. Storick assessed Plaintiff with back pain, and found his symptoms were consistent with sacroiliitis. *Id.* Dr. Storick indicated Plaintiff's lumbar MRI indicated a mild disc bulge, which he described as being "fairly typical" for Plaintiff's age. *Id.* He concluded that Plaintiff was neurologically intact and had no radiculopathy symptoms. *Id.* Dr. Storick recommended physical therapy, SI joint injections, and pain medication, released Plaintiff to "light duty with a 10–20 pound weight limit," and indicated Plaintiff was to contact his office if he experienced acute changes in symptoms or problems with medications. *Id.*

On December 2, 2008, Dr. Storick also completed a Work Status Information form diagnosing Plaintiff with left-side sacroiliitis and indicating Plaintiff could return to full-time light duty work limited to lifting, carrying, pushing, or pulling 10–20 pounds, with no other exertional limitations. Tr. at 320.

Dr. Storick administered a series of SI joint injections on January 15, 2009 (Tr. at 332–37), January 29, 2009 (Tr. at 338–44), and February 20, 2009 (Tr. at 345–50). Plaintiff began physical therapy with Progressive Physical Therapy on January 16, 2009. Tr. at 351–52.

On February 10, 2009, Plaintiff's PT noted he had progressed with his exercise program, and demonstrated improved mobility and function. Tr. at 352. Plaintiff told the therapist his pain returned when he was not taking pain medication, and his PT noted continued physical therapy would benefit Plaintiff's ability to perform work-related functional activities. *Id.*

On February 20, 2009, Plaintiff told Dr. Storick that his pain was intermittent and seemed to be associated with activity. Tr. at 350. Plaintiff told Dr. Storick that the SI injections had offered temporary pain relief, but that pain had returned and was an 8/10. *Id.* Plaintiff indicated he saw a little progress through physical therapy, and Dr. Storick instructed him to continue it to strengthen his pelvic musculature. *Id.* Dr. Storick noted Plaintiff was on moderate strength opioids, and thought there was "little chance of making much more improvement." *Id.* Dr. Storick affirmed his earlier assessment that

Plaintiff could return to light duty work, but with an increased ability to lift/carry/push/pull from a range of 10–20 pounds to 20 pounds. Tr. at 349–50, *cf.* Tr. at 320.

On February 24, 2009, Plaintiff's PT indicated he was progressing well with lumbar stability and work-related activities such as lifting and pulling, and that he had no major reports of pain from activities of daily living ("ADLs"). Tr. at 351.

In May 2009, HealthSouth PT Mimi K. Rawson evaluated Plaintiff's RFC at Dr. Storick's request and found Plaintiff was "functioning in the light category of work as defined and outlined in the Dictionary of Occupational Titles" and provided consistent effort during testing. Tr. at 357, 360, *see* Tr. at 353–67. Plaintiff reported he walked three times a week for about one hour, including breaks, and PT Rawson observed that he could sit continuously for 50 minutes without changing positions. Tr. at 360, 365. PT Rawson opined Plaintiff could perform work at the light exertional level, with the additional limitation of no sustained squatting, bending or forward reaching. Tr. at 356–57. The functional capacity evaluation form's signature block for physician agreement was not signed. Tr. at 356.

On July 1, 2009, Plaintiff saw Dr. Keisler and reported that medications helped his back pain, but that an orthopedist and worker's compensation doctor told him there was nothing further that could be done. Tr. at 368–69. Dr. Keisler noted Plaintiff's pain was in his right leg and hip area, but indicated the pain had been on his left side previously. Tr.

at 368. Dr. Keisler observed that Plaintiff's gait was antalgic, listed his back pain as unchanged, and noted he had not reviewed Plaintiff's orthopedic or worker's compensation evaluations. Tr. at 370. Dr. Keisler noted that Plaintiff remained unable to work. Tr. at 369.

On July 20, 2009, Dr. Keisler completed a Medical Source Statement form regarding Plaintiff's RFC. Tr. at 371–74. Dr. Keisler opined that Plaintiff was unable to engage in substantial gainful activity for an undetermined period of time because of persistent chronic back pain. Tr. at 373–74. Dr. Keisler opined that medications Plaintiff took for pain and for muscle spasm could cause drowsiness that would potentially impact his ability to work. Tr. at 373. Dr. Keisler did not provide the date Plaintiff's inability to work began, nor did he complete the portion of the form regarding Plaintiff's functional abilities to perform specific exertional activities, such as lifting/carrying, standing/walking, as well as postural and manipulative activities. Tr. at 371–73. Below his signature line, Dr. Keisler noted that Plaintiff "has had disability determinations by orthopedic consultants and Workmans Compensation Doctors." Tr. at 374.

C.     The Administrative Hearing

Plaintiff testified that he lived with his mother, nieces, and girlfriend and did no housework, yard work, or grocery shopping. Tr. at 27–29. He said he had a driver's license, but did not drive because pain medications made him drowsy. Tr. at 24, 26. Plaintiff testified that he walked two or three miles per day for exercise and to keep him

15

from only sitting and watching television. Tr. at 29. He indicated that his back tightened and pain moved to his hips after walking about half a mile, requiring him to take breaks when needed. Tr. at 30. He said he could sit for about 45 minutes before his back began bothering him and that hip pain made it difficult for him to put on his socks and shoes. Tr. at 31. Plaintiff testified that he had severe pain every day and that the pain medication he took each day relieved his pain for about one or one and a half hours. Tr. at 32–22.

Dr. Stewart testified that Plaintiff's PRW as a coatings operator required medium exertion, his work at the chemical plant was generally medium in exertion, but could sometimes require heavy exertion, and that both of those jobs had SVPs of 4, making them semi-skilled. Tr. at 34. Based on file information, the VE opined Plaintiff's work as a sanitation worker would have also have required medium exertion, but would have been unskilled, with an SVP of 3. *Id.* The ALJ questioned Dr. Stewart about an individual who had Plaintiff's age, education, and work history, and had the RFC to lift and/or carry 10 pounds frequently and 20 pounds occasionally, to stoop, twist, crouch, kneel, and climb stairs and ramps occasionally. Tr. at 34–35. The hypothetical individual would have a 45 to 60 minutes sit/stand option; never be required to use foot pedals or other controls with the left lower extremity; be limited to performing simple, routine tasks in a supervised environment with no required interaction with the public or team-type interaction with coworkers; and would have to avoid hazards such as unprotected heights and dangerous machinery. Tr. at 34–35. Dr. Stewart testified that such a person could not perform

16

Plaintiff's PRW, but could perform other work that existed in the national and regional economy. Tr. at 35. Specifically, Dr. Stewart opined the hypothetical individual could perform jobs such as the unskilled light jobs of bench hand workers (hand packers, sorters, cleaners, trimmers, and weight testers), machine tenders, and inspectors/examiners. Tr. at 35–36. In response to a question from Plaintiff's counsel, Dr. Stewart testified that all of the jobs he had described required sustained forward reaching. Tr. at 37.

II.     Discussion

Plaintiff argues the ALJ erred by: (1) not giving controlling weight to Dr. Keisler's opinion; (2) failing to sufficiently explain how he determined Plaintiff's RFC; (3) discounting Plaintiff's subjective complaints; and (4) finding jobs existed in the economy that Plaintiff could perform. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     The ALJ's Findings

In his September 1, 2009, decision, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.     The claimant has not engaged in substantial gainful activity since June 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: back and left hip pain and side effects of pain medications (20 CFR 404.1521 *et seq.*).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity for simple, routine tasks in a supervised environment with no requires interaction with the public of "team"-type interaction with co-workers; no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; a 45-60 minute sit/stand option at the workstation; only occasional stooping, twisting, crouching, kneeling and climbing of stairs or ramps; no climbing of ladders or scaffolds; no foot pedals or other controls with the left lower extremity; and avoidance of hazards such as unprotected heights and dangerous machinery.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on June 16, 1966 and was 39 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82–41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2006, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 10–19.

18

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings; (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents him from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520.  These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can

19

find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step.).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The

scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.     Analysis

1.     The ALJ Appropriately Considered the Opinion of Plaintiff's Treating Physician

Plaintiff argues the ALJ erred because he did not give controlling weight to his treating physician's opinion that persistent back pain made him unable to work. Plaintiff claims the ALJ should have deferred to Dr. Keisler's opinion because it was "well-supported by medically acceptable techniques" and "'not inconsistent' with other evidence." 20 C.F.R. § 404.1527(d)(2). Pl.'s Br. at 21.

In considering Dr. Keisler's opinion, the ALJ found:

I have considered the physical medical source statement of Dr. Keisler dated July 20, 2009. While Dr. Keisler was of the opinion the claimant was unable to engage in substantial gainful activity due to persistent chronic back pain, he placed no restrictions on the claimant other than the pain medication and medication for muscle spasms may cause drowsiness. The opinion expressed is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion. Therefore, I cannot give Dr. Keisler's opinion controlling weight in the determination of the claimant's residual functional capacity.

Tr. at 16–17.

If a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. § 404.1527(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996)

22

(finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(d)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro*, 270 F.3d at 176. In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

The ALJ discounted Dr. Keisler's July 20, 2009 opinion, noting the opinion did not place specific restrictions on Plaintiff's RFC and that Dr. Keisler did not explain what

evidence supported his conclusions. Tr. at 17. Plaintiff cites to medical records, including some from his long-term treatment by Dr. Keisler and his colleagues, claiming they provide ample support for the opinion. Pl.'s Br. at 17, 20–21 (citing records of Dr. Keisler, his colleagues, and other providers). Plaintiff argues that because Dr. Keisler followed accepted practices, ordered tests, and kept appropriate notes, the ALJ should have applied his decision as controlling. *See* Pl.'s Br. at 20–21. The court disagrees.

In considering Plaintiff's disability status, the ALJ provided a detailed discussion of Plaintiff's medical history, including treatment by Dr. Keisler. Tr. at 13–15. Neither in treatment notes, nor in his 2009 opinion did Dr. Keisler place specific limitations on Plaintiff's RFC other than the opinion's mention that Plaintiff's medications could make him drowsy. Tr. at 371–74. Dr. Keisler did not complete the portions of the form regarding his assessment of Plaintiff's ability to perform specific work-related activities. Tr. at 371–73. Rather, he merely indicated Plaintiff's back pain made him unable to work and noted that disability determinations had been done by orthopedic consultants and by workers' compensation doctors. Tr. at 374. Dr. Keisler's contemporaneous notes indicated he had not reviewed those evaluations. Tr. at 370. In addition, the workers' compensation doctor to whom Dr. Keisler referred, Dr. Storick, specifically found that Plaintiff retained significant work-related functional abilities, and the ALJ gave Dr. Storick's opinion great weight. Tr. at 330–31.

24

The ALJ was not required to give Dr. Keisler's opinion deference. *See* 20 C.F.R. § 404.1527(a), (b) (indicating Commissioner considers medical opinions, defined as statements "from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairments, including [] symptoms, diagnosis and prognosis, what [claimant] can still do despite impairment(s), and [claimant's] physical or mental restrictions."). Additionally, Dr. Keisler and his colleagues deferred much of Plaintiff's treatment to specialists, including neurologists Dr. Waheed and Dr. Pusey and pain-management specialist Dr. Odom. *See, e.g.,* Tr. at 212 (Dr. Raynal's noting Plaintiff should be able to return to work, pending agreement by neurologist), Tr. at 223–23, 303 (Dr. Keisler's instructing Plaintiff to continue to see Dr. Odom for treatment of pain). None of these specialists opined Plaintiff was unable to work. Under these circumstances, the ALJ could reasonably conclude that Dr. Keisler's opinion did not provide an accurate picture of Plaintiff's impairment, despite his status as treating physician. *See* 20 C.F.R. § 404.1527(d)(2)(ii) (noting nature of treatment relationship as factor in considering opinion evidence and providing example of giving less weight to an ophthalmologist's opinion regarding neck pain than the opinion of another physician who treated the neck pain).

Further, determinations regarding whether a claimant is disabled and related legal conclusions are administrative determinations for the Commissioner and not for medical personnel. 20 C.F.R. § 404.1527(e) (noting certain opinions by medical sources—such as

being "disabled" or "unable to work"—are not afforded "special significance"). The ALJ appropriately discounted Dr. Keisler's opinion on that ultimate issue.

Plaintiff also argues Dr. Keisler's opinion is not inconsistent with other evidence. In part, Plaintiff complains that the ALJ erred by selectively citing to some "normal diagnostic and physical examination findings by Dr. Keisler, Dr. Raynal, Dr. Greenhouse, Dr. Baxley, Dr. Storick, Dr. Pusey, Dr. Naheed, Dr. Odom, and the Physical Therapy notes," and by failing to discuss other record evidence. Pl.'s Br. at 17–18 (*citing* Tr. at 13–16). The court disagrees.

When an ALJ assesses a claimant's RFC, he is to consider all of the relevant medical and other evidence. *See* 20 C.F.R. § 404.1545(a)(3). No doctor's opinion or testimony is alone conclusive on this issue. *See* SSR 96-5p. Further, the ALJ is charged with weighing the evidence and resolving any conflicts. *See Craig*, 76 F.3d at 589. The ALJ need not provide a written evaluation of each piece of evidence, but must articulate his reasoning so that the reviewer may "make a bridge" between the evidence and conclusions. *Jackson v. Astrue*, 8:08-2855-JFA, 2010 WL 500449, *10 (D.S.C. Feb. 5, 2010) (internal quotation omitted). The ALJ did what he was supposed to do by considering and weighing all of the evidence and explaining his decision in a way that permits the court's review.

Plaintiff also argues the ALJ improperly gave great weight to the opinion of Dr. Storick. Pl.'s Br. at 21–23. The court disagrees.

26

As noted above, Dr. Keisler's July 2009 opinion referenced disability determinations that had been provided by orthopedists and workers' compensation doctors. Tr. at 374. One such determination was provided by Dr. Storick, who opined Plaintiff could perform light duty, the ALJ noted:

> I have considered Dr. Storick's opinion that [Plaintiff] can return to light duty. The opinion of a treating physician is entitled to great weight unless there is persuasive contradictory evidence. I find Dr. Storick's opinion supported by the evidence of record when considered in its entirety. It is emphasized that the restriction to light duty is consistent with restrictions as determined in this decision. Accordingly, such opinion is given great weight in arriving at a decision.

Tr. at 17.

The court finds the ALJ appropriately considered and gave great weight to Dr. Storick's opinion. In addition to evaluating Plaintiff for his employer's workers' compensation carrier, Dr. Storick treated Plaintiff after giving the evaluation. Tr. at 330–31 (opinion), *e.g.*, Tr. at 332, 350 (follow-up appointments). Dr. Storick's opinion referenced clinical and diagnostic evidence he considered in forming his opinion. Tr. at 330–31. *See* 20 C.F.R. § 404.1527(d)(3) (noting the more relevant evidence a source provides as support of an opinion, the more weight the Commissioner gives the opinion); § 404.1529(c)(3) (indicating ALJ's credibility determination may be supported by the opinion of a non-treating physician); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (finding consultative physician's opinion may constitute persuasive evidence to support an ALJ's determination). For example, Dr. Storick described Plaintiff's lumbar MRI scan

as showing a mild disc bulge that was typical for someone Plaintiff's age and found Plaintiff showed no radiculopathy symptoms and was neurologically intact. Tr. at 331. He also performed several relevant tests during the consultative examination, including Plaintiff's ability to forward flex and straight leg raise. *Id.*

Plaintiff's claim that Dr. Storick did not find Plaintiff could perform at the light exertional level is without merit, as well. Pl.'s Br. at 23. In addition to the written opinion based on his examination and diagnostic evidence, in which he released Plaintiff to "light duty work," Dr. Storick completed a separate form in which he was asked to identify Plaintiff's RFC, including limitations on his ability to sit, stand, lift/carry/push/pull, climb, bend, stoop, twist, stretch, kneel, squat, crawl, and engage in overhead work. Tr. at 320. Dr. Storick limited Plaintiff's RFC only by opining he could lift/carry/push/pull 10 to 20 pounds. Tr. at 320. The ALJ specifically noted that finding and incorporated it into Plaintiff's RFC. Tr. at 13, 15.

Two months after rendering the December 2008 opinion, Dr. Storick examined Plaintiff and reaffirmed his assessment. Tr. at 349–50. Based on the February 2009 examination findings, Dr. Storick again opined Plaintiff could perform light duty work, and, again, limited only Plaintiff's ability to lift/carry/push/pull more than 20 pounds. Tr. at 349. The ALJ discussed that follow-up in his decision. Tr. at 15.

The court finds the ALJ appropriately considered the opinions of Dr. Keisler and Dr. Storick, as well as other record evidence, in determining Plaintiff's RFC. Plaintiff's first allegation of error is dismissed.

2.     The ALJ Provided Sufficient Analysis of Plaintiff's RFC

Plaintiff next claims the ALJ did not sufficiently detail what evidence supported his conclusions and did not cite sufficient medical and nonmedical facts regarding those conclusions in providing his RFC. *See* Pl.'s Br. at 24. The court disagrees.

The ALJ included several pages of detailed discussion of Plaintiff's medical history, treatment, and diagnoses that informed and supported his findings. Tr. at 12–17. The ALJ indicated he considered "all of the evidence" and he referenced some evidence that suggested limitations greater that he included in Plaintiff's RFC. Tr. at 10, *see* Tr. at 12–17. For example, the ALJ discussed PT Rawson's assessment that Plaintiff could not perform sustained bending, squatting or forward reaching, although he did not include such limitations in the RFC. Tr. at 16.

Plaintiff specifically contends that the ALJ erred in providing his RFC because he did not evaluate the side effects of Plaintiff's medications in considering his subjective complaints and in establishing his RFC. Pl.'s Br. at 24. The court disagrees.

The ALJ noted that the only restriction on Plaintiff's RFC that Dr. Keisler provided in his opinion was that his pain medications could cause drowsiness. Tr. at 17. In his decision and in his hypothetical to the VE, the ALJ explained that Plaintiff should

29

be "limited to performing work with restrictions that require, due to side effects of pain medication, simple, routine tasks in a supervised environment, with no required interaction with the public or team-type interaction with coworkers." Tr. at 34, *see* Tr. at 15, 17.

The court finds that the ALJ considered Plaintiff's credible limitations in assessing Plaintiff's RFC and that the ALJ included sufficient discussion of that assessment in his decision. The ALJ's decision is supported by substantial evidence, and Plaintiff's allegation of error is dismissed.

3.     The ALJ Appropriately Considered Plaintiff's Subjective Complaints

Plaintiff argues the ALJ did not adequately discuss his decision that Plaintiff's subjective complaints of disabling pain were not fully credible, violating SSR 96-7p. Pl.'s Br. at 25–28. The court disagrees.

SSR 96-7p requires that, prior to considering Plaintiff's subjective complaints, the ALJ must find there is an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. If so, the ALJ is to consider the record as a whole, including both objective and subjective evidence, in assessing Plaintiff's credibility regarding the severity of his subjective complaints, including pain. *See* SSR 96-7p; *see also* 20 C.F.R. § 404.1529(b); *Craig*, 76 F.3d at 591–96. The ALJ need not accept Plaintiff's subjective complaints at face value and may consider his credibility in light of

his testimony and the record as a whole. Although objective medical evidence is a factor for the ALJ to consider, as Plaintiff points out, medical records alone are not sufficient to refute his claims regarding pain or other subjective symptoms. *See* Pl.'s Br. at 26. If the ALJ rejects a claimant's testimony about his pain or physical condition, he is to explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence and to permit the claimant and subsequent reviewers to understand the weight and the reasons for the weight the ALJ gave Plaintiff's subjective claims. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989) (*quoting Smith v. Schweiker*, 719 F.2d 723, 725 n.2 (4th Cir. 1984)); SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process. *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms he alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of his symptoms was "not entirely credible to the extent" the testimony was inconsistent with the ALJ's determination of his RFC. Tr. at 16.

The court finds that the ALJ adequately considered Plaintiff's subjective complaints and articulated his reasons for finding his claims about his pain less than fully credible. The ALJ's determination is supported by substantial evidence.

The ALJ referenced the lack of objective medical evidence to support the extent of Plaintiff's claims. Tr. at 16–17. For example, he discussed Dr. Storick's opinion in detail

and noted that the opinions of the state agency consultants supported Plaintiff's RFC to perform light work. Tr. at 15, 17, 19. In addition, the ALJ discussed Plaintiff's ADLs, which included walking two or three miles each day, as well as the conservative nature of his pain treatment. Tr. at 16. (discussing Plaintiff's ADLs and noting Plaintiff's excellent response to injections and pain medications). Although not independently determinative of the issue of disability, the ALJ could reasonably conclude that the progress Plaintiff achieved with treatment did not support his allegations of disabling pain, but instead provided evidence supporting the opinions of Dr. Storick and the state agency examiners that Plaintiff could perform some work. *See* 20 C.F.R. § 404.1529(c)(3)(i) (ADLs are relevant factors when evaluating symptoms); *Johnson*, 434 F.3d at 658 (the ALJ logically reasoned that claimant's ability to engage in a wide variety of activities was inconsistent with her statements of excruciating pain and her inability to perform such regular movements like bending, sitting, walking, grasping, or maintaining attention). The ALJ could reasonably infer from Plaintiff's conservative treatment that his doctors did not think his condition was as disabling as he claimed.

The ALJ's determination not to fully accept Plaintiff's claims of wholly disabling pain is supported by substantial evidence, and Plaintiff's third allegation of error is dismissed.

4.     The ALJ Appropriately Found That Jobs Exist in the Economy That Plaintiff Could Perform

Plaintiff argues the ALJ erred by not analyzing PT Rawson's finding that Plaintiff could not perform sustained forward reaching and not including that limitation in the RFC or in questions to the VE. Pl.'s Br. at 30, *see* Tr. at 357 (PT Rawson's finding that Plaintiff "did not demonstrate the ability to perform sustained bending, sustained squatting, or sustained forward reaching"). In response to questions by Plaintiff's counsel, the VE testified that an individual would not be able to perform the jobs he identified in response to the ALJ's questions if a limitation on sustained forward reaching were added. Tr. at 37. As a result, Plaintiff claims the ALJ erroneously found there were jobs in the economy that he could perform. The court finds this was not error.

A PT is not an "acceptable medical source," meaning a PT's opinion may be given less weight that some treating sources, such as treating physicians. *See* 20 C.F.R. § 404. 1513(d)(1). In summarizing relevant medical evidence, the ALJ noted the findings of PT Rawson, including her finding that Plaintiff "did not demonstrate the ability to perform sustained bending, squatting or forward reaching," (Tr. at 16), but determined Plaintiff's ability to perform sustained reaching was not limited. Having reviewed the evidence, including the opinions of Dr. Keisler, Dr. Storick, and the state agency physicians, the court finds the ALJ's determination is supported by substantial evidence. *See* Tr. at 234, 248, 320, 349.

Accordingly, Plaintiff's allegation of error is without merit. *See Lee v. Sullivan*, 945 F.2d 689, 692 (4th Cir. 1991) (affirming denial of benefits and noting a functional limitation claimant's counsel included in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record."). Here, the ALJ appropriately relied on the VE's testimony that jobs existed in the economy that Plaintiff could perform with the RFC as found by the ALJ.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that the Commissioner performed an adequate review of the whole record and that the decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under Section 1631(c)(3) of the Act, 42 U.S.C. Sections 405(g) and 1383(c)(3), this matter is affirmed.

IT IS SO ORDERED.

*Shiva V. Hodges*

September 20, 2011                    Shiva V. Hodges
Florence, South Carolina             United States Magistrate Judge